Our next case is Cansler v. Hanks, number 181196, Mr. Glassberg, representing the appellants. Mr. Glassberg, it's good to have you here. It's nice to see you again, sir. It's good to be here, and thank you for inviting us to West Virginia. Elton Cansler was tased in the back within seconds of surrendering, putting his hands on the car, before he had any time to comply with any instruction that he might have been given. Sorry, could you pull the microphone maybe a little closer? Thank you. Yes, ma'am. Shall I repeat what I said? Elton Cansler was tased in the back within seconds of his surrender and turning to place his hands on the police cruiser. He was tased because the officer... Mr. Hanks was the police officer who used the taser. Yes, sir. And Officer Hanks thought that Elton was thinking of reaching for his knife. A pocket knife? Yes, ma'am, a pocket knife, which he recognized by his own testimony as a kind of pocket knife that folks carry. And he said that he understands also that people carry pocket knives without malicious intent. And they're ordinarily closed in the pocket. Yes, ma'am. That's correct. Take a while to get to that. He did not see... Elton did not reach for his knife. There was no testimony that Elton reached for his knife. And there's a video. There is a video. I'll get to the video, ma'am. He did not see... This case comes up here after a trial by jury. Yes, sir. And we take the facts in the light most favorable to Officer Hanks. You do, which is one of the reasons that my brief is based exclusively on the testimony of Officer Hanks. The only exception is testimony by his expert who says this is surrender. Everybody knows it. The elementary point in the case is that Officer Hanks acknowledges not only that Elton did not reach for his knife, not only he did not think that Elton was reaching for his knife. He thought that Elton might be thinking of reaching for his knife and tased him within seconds of his placing his hands on the officer's car. Right. And the jury heard all of this. Going back to Judge King's question, the jury heard all of this. So what are we to do about it now? You're to do what Judge Godwin did in Sawyer v. Osbury, which he said the jury did what they thought was right and simply got it wrong. A rare event. So you say the case should not have gone to the jury or that the judge should have thrown it out after the verdict came in? Yes, sir. Yes, sir. Wait, before that, didn't the jury get it wrong perhaps because they weren't properly instructed? There's no doubt about that. I think that's a pretty strong argument. I do also, but I try to respond to the judge's questions. Right. You're saying the jury just got it wrong. There were two different issues here. They're independent, but they're independent grounds for reversal. I do believe that the instructions were incorrect because they didn't provide the instruction, which said you needed an immediate risk of harm. That was an erroneous instruction. And that's perhaps why the jury got it wrong. I have no doubt that that contributed to the error made by the jury. Now, another thing that contributed to it was the expert for Officer Hanks took the position that this is in the appendix at page 300, that the knife, the pocket knife, changed everything. Permit me to read, if I may, from page 300 of the appendix because it addresses this issue and it addresses both the question of the instruction or it has implications both for the problems with the instruction and for what the jury was able to find. This is Mr. Chaney, one of the use of force experts in the case on page 300. And he's talking about the incident and what he would have to understand in order to assess what happened. I need to know what took place before that, that is to say before the tasing. Now, if you're going to tell me that what took place before that was he was coming out of church singing, singing hymns, and he was in his choir boy outfit and he just took it off, then why did you tase him? But if you're going to tell me that he was just arrested for committing a crime and he's carrying a knife, that changes everything. So you can't just focus on that. Now, I acknowledge that you have to have the totality of the circumstances. The totality of the circumstances are that the crime for which he was arrested was taking a pair of sunglasses from a bank and immediately voluntarily giving them back to the officer who asked for them. And the jury is told by the expert that the fact of the knife changes everything. The knife becomes kind of a talisman for creating a totality of circumstances that doesn't make it necessary to focus on what happened after the surrender. And just to focus even more particularly on that, I quoted Henry versus Purnell to this expert at page 294. Actually, it was their other, their two use of words. That's one of our in-bank decisions. Yes, it is. It is an in-bank decision. Involving matters like this. Yes. 1983 case. That's correct. And I quoted from that case. I would like to ask you if you agree. This is a 295. I would ask you to agree. If you agree that in considering whether Officer Hanks' use of the taser was reasonable, you must focus on the moment that the force was used. Would you agree with that? No. So the combination of the failure to instruct combined with the failure, I respectfully submit, appropriately to credit the video evidence in light of Scott versus Harris led to this verdict. And what was the instruction that you offered that the court did not give? It was right out of Yates. And it said, quoting Yates, deploying a taser is a serious use of force that is designed to inflict a painful blow. It may only be deployed when a police officer is confronted with an exigency that creates an immediate safety risk that is reasonably likely to be used by using the taser. That we thought that it was critical because of the difference in circumstance in terms of the struggle that had taken place. Was that from an instruction in the earlier case? Yes, sir. That was our instruction. That was not a trial. That was not given. Not given. That instruction was. But the quote you gave, the earlier case wasn't tried. Yates wasn't tried. No, it was not. This was a trial. Yes. This was a trial. That's correct. It was not an instruction in the earlier case. That's correct. Now, in opposing counsel, I'm sure is going to say that what you wanted the jury instructed about was substantially covered already in the jury instructions. What's your response to that? What was not substantially cut was I wouldn't say it was not substantially covered. It was not covered. The proposition that the use of the taser has to be justified by an exigency that creates an immediate safety risk. That's a temporal thing. Now, we review the denial of a proposed instruction at a jury trial for what? For incorrect or insufficient statement of the law. We review it for abuse of discretion. You have to convince us that Judge O'Grady, the trial judge, abused his discretion in failing or refusing the instruction that you proposed. Yes, sir. And that you're arguing about. Yes, sir. That was an abuse of discretion. We don't review it de novo. It's an abuse of discretion review. And you have to convince us that Judge O'Grady abused his discretion at this trial to be able to claim error successfully in the failure to give that instruction. That's your instruction issue. And then you got another issue. Well, it shouldn't have gone to the jury anyway, basically. Is that correct? Yes, and let me address both of those. Okay. Can I talk? You just read the instruction, right?  You have it in front of you still. Yes, ma'am. Two sentences, right? Yes, ma'am. And the first one, deploying a taser is a serious use of force that is designed to inflict painful blow. Hanks objected to the first part of the instruction and the district court then excluded the whole instruction. But you never objected. There was never any talk about the second sentence. It may only be deployed when a police officer is confronted with an exigency that creates an immediate safety risk that is reasonably likely to be cured by using the taser. You don't object when the district court excludes the whole instruction. Judge . . . Refuses to give the whole instruction. There was an objection to the failure to give the instruction. There's an objection to . . . there's discussion of the first . . . of the first sentence. I mean, if you can show me, we're happy to look at it. I'll take a look at it, Judge. This may mean you have plain error review. Well . . . Right? If you have jurisdiction. I may have misunderstood things, but . . . Well, I think so, Judge, and I'll have to . . . The story is . . . Permit me to find that. Sure. And you can do it when you're sitting down there. You don't have to use your time. Okay, thank you, Judge. What happened to count three? That was a due process matter. That was a due process matter that . . . I think that's where you're trying to supervise reliability claims. Yeah, no, that's not before this court. Well, it was dismissed without prejudice. Yes, it was, and it was not brought back. What? It was not brought back. Well, it was never . . . It was dismissed without prejudice, and there was never a final order as to count three. There was a final order as to the case. But as to count three, the only time it was mentioned it was dismissed without prejudice. Yes, sir. Okay. So, if it was dismissed without prejudice, you've got to . . . Something has to be done to clean it up. Well, that's with regard to . . . To have 1291 jurisdiction. Well, that's simply with regard to that claim of supervisory reliability, which we did not proceed with. Well, but you've got to dismiss without prejudice. Yes, sir. It's got to be out of the case. In other words, for us to have appellate jurisdiction. The way the record looks now, it's still hanging there in front of the district court, right? So, you either have to make a representation to us that you are not pursuing it . . . I make that representation. . . . and maybe file a piece of paper saying that you are dismissing it voluntarily. I make that representation, Judge. I was under the impression that the conclusion of the case on the . . . Well, you filed the Notice of Appeal and you say in the Notice of Appeal you're only appealing this Count 1 deal. That's correct. And Count 3 is still in there. Okay. So, it's my . . . But if Count 3 is still in there, you don't have a final order. That's my bad. I . . . If you don't have a final order, all this is for naught. I can assure you that it was my intention to appeal the entire case with Count 3 being out of the case as of the time it was dismissed. And if it's my error in not having memorialized that, that's on me. And you're memorializing it right now. Well, there's no doubt about that. And you're telling us that Count 3 is not in this case. That's correct. It'll never be pursued. Never be pursued. It's treated as dismissed with prejudice. With prejudice. It's out of this case. Out of this case. And we got to decide whether that representation is good or not. We'll see what the other side says too. But anyway, go ahead. All right. Uh, you were asking me about the sufficiency of the instruction or I was . . . I was not. I was asking about . . . Judge Motz was . . . I was asking about the jurisdiction. Judge Motz was talking about . . . Yes, ma'am. It's at 336 when you sit down. You can . . . That's where you're . . . Okay. We'll be talking about. But I thought you sit . . . We stopped you when you said there are two points. There's the jury instruction and then I thought you were also making maybe an argument as a matter of law. You're entitled to direct a verdict here? Yes. That has to do with Scott versus Harris. In other words . . . You're saying the case should never have gone to the jury. Yes. I'm trying to help you here. It never should have gone to the jury. There wasn't enough evidence. No doubt about that. And we move for a judgment as a matter of law as well. And we move for judgment notwithstanding the verdict on the grounds that the video by itself properly should have constrained the jury from making the finding that it made. And I stand on that regardless of whether the instruction was or was not appropriate, although I do believe that the failure to give an immediate risk or immediate harm instruction facilitated the jury's coming to the decision that it did. But even without regard to that, what the jury did is, I respectfully submit, not tenable. And it's also particularly not tenable in light of the justification for the tasing offered by Hanks. It's not that Elton reached for his knife. It's not that he thought Elton was reaching for his knife. It's that he thought Elton might be thinking of reaching for his knife. That nullifies objective reasonableness as a Fourth Amendment standard. And it basically creates carte blanche for officers to do what they wish based on what they think the bad guy may be thinking of doing. It's like that movie. I can't remember the name of that movie. It's Minority Report. Minority Report, yes. But they have to, officers have to base their actions on what they think the person is going to be doing because he's not going to say, hey, I'm about to pull out my knife and stab you. He has to base it on it. So, I mean, I'm with you on that. I think you have a strong argument on the jury instruction, but I don't understand what you just said. There has to be some objective reasonableness. You see that red light? I've been on there for a while. Yes, sir. And you've been up here a lot. You understand exactly what that red light means. I do. May I answer the judge's question or not? You absolutely can if that was a question. Can you explain this? Yes. What you just said about thinking what he's going to think? Yes. The law is absolutely clear that subjective belief on the part of an officer is insufficient to justify an act of force. There has to be an objectively reasonable basis in fact. It's not simply a question of what the officer thinks, but whether there are facts that will reasonably support that thought. Okay. I got it. Right. And that's the issue here. Thank you, Mr. Glassberg. Thank you. 336. Ms. Baca. Good morning. May it please the court. My name is Kimberly Baca. I'm here with my co-counsel from trial, Robert Hardy, and together we represent Officer Hanks, who's the Fairfax County police officer who was sued in this case. You all tried the case? We did try the case and we were successful, Your Honor. We got a jury verdict in Officer Hanks' favor. And our position here is that the jury was instructed properly, that when they considered the totality of the circumstances in this case and held that up against Officer Hanks. But what about the fact that they weren't instructed about exigent circumstances and immediate threat? The exigent circumstances and immediate threat quote that counsel cites from Yates actually doesn't come from Yates. And so the whole premise here in counsel's argument is that in Yates, this court announced a new standard for taser use in the Fourth Circuit, but that's not correct. Even if we backtrack, the quote that he pulls from Yates is actually a quote from Armstrong. Armstrong was only decided three months before that. And I would submit to you that both of those cases were decided after Officer Hanks tasered Mr. Kanzler. So this, to the extent that it was a new standard, it wasn't a standard when Officer Hanks was acting in September of 2015. Regardless of that though, the Armstrong quote about needing exigent circumstances, for example, a safety risk didn't originate in Armstrong. It was pulled based on this court's analysis of other circuits and then the only two Fourth Circuit cases that had considered taser use in published opinions up to that point, which was Orem versus Repham in 2008, and Myers versus Baltimore County, which was decided in 2013. In going through that analysis, the Armstrong court says, first in Orem versus Repham, which involved the tasering and drive-stun mode of a woman who was handcuffed and rib hobbled in the back of a police cruiser who was engaged in a verbal dispute with the sheriff's deputy who had arrested her. This court says what we know from Orem is that someone who is unarmed, who is secured in handcuffs, rib hobbled in the back of a police cruiser, isn't a safety threat to the officer. And so we don't want- So what's the standard for an officer to tase somebody in the back when they're turned around with their hands up on the vehicle as they were ordered? The standard is reasonableness. The standard has to be reasonableness from the Graham case because that's how we want the courts to instruct juries to hear these use of force cases. Reasonableness that what? That there's an immediate threat? That the use of force at issue in that case specifically is proportionate to the threat that faces the officer and the needs of the officer. So there has to be some threat, some exigency. Exigency, I will agree with you because what the- But that wasn't what the jury instructed about that? No, they were instructed on the Graham standard, which requires the jury to consider- But you just agreed that exigency is part of it? Exigency is part of it. It's something that the jury has to consider when they consider all the facts and circumstances. But they weren't told by the court that they had to consider that? They were given the Graham instruction from the court. Okay, and where is that in the record? The Graham instruction was instruction number five of Mr. Chancellor's instructions. I don't have the JA number. I apologize. Could you turn to JA 336, please? I'm sorry, I don't have my record. It's a hot item here. Okay. 336? Yes. And I think that this is the objection to the instruction that they think that should have been given. And maybe you can tell me, is Mr. Hardy your colleague here? Yes, Mr. Hardy was the one who argued the jury instructions. Okay, so they have what I take to be this two-sentence instruction that I was talking to with your colleague on the other side. All right. So the court says, all right, so now I'm turning to seven, use of taser, degree of force. And the court reads the first sentence. Deploying a taser is a serious use of force that is designed to inflict a painful blow. And Mr. Hardy, why do you have reason for objection to this? And Mr. Hardy, I take as one of your colleagues, who says what . . . No, he's you. And you say what your objection is to this. And then Mr. Sokol says, who I gather is one of your colleagues, this is from a recent Fourth Circuit case discussing the level of force. Jury is going to be assessing. Know the level of force. And then the judge says, I'm not going to give it. But nobody talks about the second sentence. I agree with you. I think that counsel was under some obligation to say, well, if the first sentence is unnecessary bolstering of the plaintiff's case, then take it out and give the second sentence. And that never happened in the argument. So what do you say the standard of review is? Well, we think the standard of review is for plain error for that reason. But even if the standard is the regular standard because it's been preserved, there is no abuse of discretion here. And in support of that, I would draw you to the Noll v. Artson case. Before you get us to it, because it's still in the jury instruction. It's helpful to just kind of do that all at once. And you say there was an instruction from Graham, but you don't have it. And so we're supposed to go look, find it, and just tell me where it is in the record. I'm sure that I can find it in my brief. Because, I mean, I think that there's some interest in the jury instructions that were given here and whether they are, in fact, adequate or not. And the jury instruction, I can tell you, Your Honor, was the Graham instruction. It is at, it's at JA 347 and 348. Okay. You must determine the degree of force that's reasonable and prudent in light of all the facts and circumstances. And the big argument that they had again. So that again goes, it seems to me, to this first sentence. But I think that the more important argument for the plaintiff here was it may only be deployed when a police officer is confronted with an exigency that creates an immediate safety risk that is reasonably likely to be cured by using the taser. That's correct. And that wasn't preserved for the appeal. Well, I don't know if it was or not. We'll hear from the other side. Your position is it's not preserved. Thank you. And I would point, Your Honors, to the Knoll v. Artson case. It was a similar issue that came up after a jury trial with regard to a jury instruction that was denied on behalf of the plaintiff. And the Knoll v. Artson case, which was a case... Your brief didn't argue it wasn't preserved. It didn't argue plain error. That's correct. Our brief did argue that the standard was abuse of discretion. Which came up with the plain error. We appreciate that. So are you allowed to bring a plain error into it now? Probably not. I would agree that... So you abandoned plain error. We may be stuck with abuse of discretion, but it still isn't. But still, even if you use abuse of discretion, the record is what the record is. So you're saying there's no abuse of discretion in excluding this, in not giving this instruction on this record. That is correct. That is correct. In the Knoll v. Artson case, the issue before the court... Which case? Knoll v. Artson. There was a law enforcement officer who had discharged his firearm on a woman three different times. At issue, hotly contested in the case at trial, was whether even if two of the discharges were reasonable because the woman was in possession of a firearm, whether the third discharge of the weapon was a reasonable discharge. And before the jury was instructed, the plaintiff had asked for a jury instruction that was a quote pulled from Waterman v. Batten that stated, use of force that is reasonable at the beginning of an encounter may not be reasonable at some stage of the encounter. And the plaintiff's point in that was to draw the jury's attention, not just to the fact that that third discharge might be inappropriate, but that the jury was required to assess the reasonableness of use of force with every discharge. The district court declined to provide that jury instruction, and it went up on appeal in the Knoll case. And this court upheld the denial of that Waterman-based proposed instruction and cautioned district court judges, we're not supposed to be taking chunks of case law and fashioning them into jury instructions to be provided to the jury in a use of force case. The Supreme Court, and actually let me backtrack, the Graham language was what was given in the Knoll v. Arts and Case, and this court said that the Graham instruction gives the jury the standard that's been announced by the U.S. Supreme Court for use of force cases with law enforcement officers, and it leaves room for attorneys to argue whether the force that is used was proportionate to resistive behavior or whatever the behavior of the suspect was. I would also point out that in Scott v. Harris, we've been talking about it in terms of the fact that it included a video, but it also included good language from Justice Scalia who warned courts that we want juries, and this is a quote from Justice Scalia, to slosh our way through the fact-bound morass of reasonableness. We want juries to look at all the facts and circumstances. We don't want them to be artificially pointed to one particular circumstance in the case and focus on that, because the Graham instruction is the proper state of the law as announced by the U.S. Supreme Court. Relevance or what effect do you think the two recent taser cases from the Fourth Circuit have on this case? The recent taser cases from this circuit are important here and instructive here. We've got the Armstrong case, which involved someone who was the complete opposite of what Elton Kansler was to this officer on that day. In Armstrong, you've got someone who's not armed. He is refusing to let go of a signpost, and he's tasered multiple times by one officer, some of those times while other officers are on top of him, and so he was secured by officers. He is unarmed. He has not committed a criminal act. He's not accused of committing a criminal act, and he simply won't let go of the post that he's attached to. Mr. Kansler, on the other hand, had committed a criminal act. What about the other case? In the Myers case, you've got an individual who is committed a crime. He committed a domestic violence offense against his brother. He's inside of his house. So it's arguably a more serious crime. Absolutely. Absolutely. He's inside his house with a baseball bat. He has the baseball bat in hand, and the allegation that was decided at summary judgment in favor of the officer, but the allegation was that the officer entered the house, provided one warning for him to drop the bat, and then without giving him any time to comply with that command, the officer discharged his taser. How many warnings did the officer give here that the taser was going to be used? This officer gave no warning that the taser was going to be used, and he explained to the jury that the reason that he did that was because he didn't want to give Mr. Kansler an opportunity to prepare for the potential discharge of that taser. Right, but warnings are generally regarded. I understand that police officers have difficult jobs, and this puts them in peril, but we also are concerned about the person that's going to be tased. Absolutely. So that's why we think that warnings are a good idea. Absolutely, but this court has said and the Supreme Court has said over and over again in use of force cases that to give a warning before deploying force is always something that we would like for officers to be able to do, but that if there's not a situation where that can happen, then we don't expect them to. Officer Hanks was in a situation where he didn't feel that he could safely to himself give that warning before discharging the taser. But don't we look at what a reasonable officer in his position would have felt? Absolutely. And that's where this film maybe is helpful. It doesn't look, this person in the film does not look very threatening. I can see that. The problem with the video is that the video is a three-second clip of a 71-second encounter that this officer had with this gentleman. Well, no, it's a little longer than that. I think counsel and I agree it's a three-second video. Well, I saw more than three seconds. I don't know. The jury was given a slow-motion version of that video, and maybe that's what you saw. The jury was given the fast-paced regular speed. They were given a slow-motion. But the whole thing you're saying is 71 seconds. Yes. And it's really, this shows three seconds. Yes. And you're saying the record supports that. Yes, and I think counsel would agree. The three seconds it shows appear to be him complying. His hands are up on the vehicle. I mean, every instruction the officer gives, he complies with. No instruction that the officer gave did he comply with. The officer's instructions- Oh, yeah, put your hands up. Turn around. Turn around. The officer's instructions to him, according to the officer, 100% of the time were put your hands behind your back. And he never did that. But that's not what- That's what the two eyewitnesses testified to at trial, and that's what the officer testified to. So then you would have had him moving toward his pockets, and he would have said, oh, he's going to get the knife. Better praise him. Well, that was part of the problem. But he first told him to put his hands up. That was part of the problem, was that when the officer was hands-on with him, struggling with him for those 30 seconds or so against the car, the officer is trying to control that knife hand and bring it around behind his back, but he keeps pulling it this way. And the officer concluded that he was trying to get his hand close to the knife. It was when the officer started to run out of steam, according to his words. He was running out of steam. He knew his backup wasn't there yet. He knew he's dealing with someone who's much larger than him, who continues to struggle, who won't put his hands behind his back, and who won't bring that arm as the officer's trying to pull it. And so he makes that decision that he doesn't want to get stuck in a situation where he runs out of strength to push against Mr. Kanzler and hold him against the car while he can try to put his hands behind his back. And so that's when he backs up and he decides he needs to transition to the taser. And so what you have here is someone who has ignored the verbal commands. He has to be told several times, keep your hands out of your pockets. Remember, Mr. Kanzler is reaching into that pocket. He's not just someone who's walking around with a pocketknife, like many people do. This officer knows about people carrying pocketknives. But he also testified at trial that in his experience as a law enforcement officer, that clip that he saw doesn't necessarily mean a folded pocketknife. It could be anything. And so what he knew from that was, I have an armed individual. He's committed a criminal act. He produced the sunglasses. And so everyone knows here, I think you committed a crime and you've admitted to me that you've done that. And so the next step is we need to secure that knife so that everybody's safe while we continue this investigation. Mr. Kanzler refused to do that. He repeatedly put his hand in the knife pocket, which Officer Hanks reasonably, according to the jury, interpreted as he's making these movements towards this knife. It doesn't make any sense that he's doing that in the larger context of being told to put his hands behind his back. And so I need to control that knife hand. And that's what Officer Hanks was doing the entire time that Mr. Kanzler was struggling with him and sticking his hand in that knife pocket. Is it fair to say that everybody involved here knew this was a fairly close case? You all claim qualified immunity. That's true. For Officer Hanks and Judge Grady denied it. That's correct. And because there were disputes of fact. Right. And he had a trial and the jury stayed out for a couple of days. Yes. And they resolved it in the final analysis in favor of the reply. That's correct. And Officer Hanks gets the benefit of that jury verdict at this point. This was a hotly contested case. The facts were close. And I will point out that while it is true that the district court denied qualified immunity, it's still out there. So if this case goes back with instructions from this court that the jury verdict should be overturned, then we still have the qualified immunity issue that needs to be dealt with in the district court. Well, you could still win here on qualified immunity, couldn't you? We put it in our brief because we think that the facts that were presented during the trial give rise to a conclusion that Officer Hanks is entitled to qualified immunity. There's never been a case in the Fourth Circuit where this court has ruled that an officer dealing with an armed criminal suspect who has actively resisted arrest for a period of time, refuses commands to put his hands behind his back, wouldn't appropriately be tasered by the officer. And I would point out, too, that Officer Hanks deployed that taser one time. After he deployed the taser one time, Mr. Kanzler was safely taken into custody, and that was it for the use of force. And so that's something that this court can consider as well and that the jury can consider and surely did consider in determining whether Officer Hanks' actions that day were reasonable. Officer Hanks did on that day what this court wants officers to do. He went step-by-step through verbal commands, physical hands-on movement, and it was only when he started to run out of gas that he decided he needed to step back and protect himself from the potential of that deadly weapon. Counsel has argued all along in this case that this is the minority report. Officer Hanks thinks he can read Mr. Kanzler's mind and he knows he's going for that knife, but that's not what Officer Hanks testified to at trial. What Officer Hanks testified to at trial was that after marching through all of those steps that he knows he's supposed to march through, when dealing with someone who's actively resisting arrest, who he knows is in possession of a weapon, he made a split-second decision. So he didn't testify that he thought that the defendant was thinking about pulling his pocketknife? He testified that the last movement that Mr. Kanzler made, he puts his hands up and then in Officer Hanks' perception, he sees Officer Hanks with the taser in his hand. And so at this point in their interaction with each other, according to Officer Hanks, this is when the decision is going to be made by Mr. Kanzler. I might run. I might turn around and try to fight with the officer. And so he's preparing for the potential for that to happen. And Mr. Kanzler swings around and throws his arms up in the air, sees the taser, and immediately hides his arms. He's not just putting his hands on the car. He's putting his hands on the car in a manner that prevents Officer Hanks from seeing where those hands are. And what Officer Hanks sees as the last, I guess, triggering physical action by Mr. Kanzler that causes him to think that he needs to discharge the taser, is he sees Mr. Kanzler's head turn and he's looking towards that pocket. And Officer Hanks testifies, I think he's saying, I don't know if he's got my knife. And so if he's going to have a taser, then I need something for myself. And so this is Officer Hanks' last movement that leads to Mr. Kanzler accessing that knife in his pocket. Officer Hanks knows he can't let it get to that point because then he's dealing with someone who's in physical possession of that knife. And that's a very real safety concern for Officer Hanks. And so he eliminated that threat reasonably by discharging his taser one time, which allowed him to hold steady until his backup arrived and they were able to get Mr. Kanzler safely into custody. How long was it before backup arrived? Backup arrived while Mr. Kanzler was still laying on the ground. Officer Hanks was continuing to provide him with commands because Mr. Kanzler actually shoved his arms underneath his body after he was tasered. And so Officer Hanks wouldn't go hands on with him yet because of that very real safety concern. Officer Hanks didn't discharge his taser a second time, which we would argue he could have done. He held steady. He knew his backup was coming at some point and he waited until backup arrived. And so it was it was a period of several seconds. Was Mr. Kanzler injured? Mr. Kanzler testified at trial. He had the taser bar marks on his back. He received treatment for that. He testified to some emotional difficulties that he had after that with regard to the tasering. But otherwise, he was not injured. Was he charged with an offense? He was charged with the petty larceny for stealing the sunglasses and was convicted of that crime. And was he in prison for that? I don't think he went to jail for that offense. It was a misdemeanor, right? Yes, it is a misdemeanor. All this is in Fairfax County. Yes, that's correct. $100 sunglasses. That was what he took. Yes. Thank you. Thank you, Ms. Baucom. We appreciate it. Thank you. Mr. Glassberg. First, with regard to the instructions. The key to the objection is when Ms. Sokol says, the jury is going to be assessing whether use of a taser was proportional here. The issue in proportionality is to weigh, if you will, the risk facing the officer and the damage, so to speak, done to the suspect. Now, there's very little in life that I couldn't redo better. But in the give and take, the judge makes it clear. You hear my – and I think you've done the best you can do with this. The only language that anybody quotes is the first sentence. Except for the proportionality matter. Well, the first sentence, though, it does say a serious use of force. So in the word serious, there is a proportionality. I mean, there's serious and there's minor. Well, permit me to say this. Sometimes serious use of force is necessary and appropriate. And simply saying that it's a serious use of force may be inconsequential if you're faced with three armed men. But what I'm saying to you is you said to me in response to, well, you've only challenged this first sentence. You say, but we do talk about proportionality. And I agree with you. You do talk about proportionality. But the proportionality can be directed at the first sentence to which you objected, not to the second sentence. I mean, it could be the second sentence, but you never raised an objection to the second sentence. Now, maybe everybody understood that. I hear you on this. Respectfully, counsel's failure to raise this issue at all. It's never been raised until you raised it. I understand it. All I have is the record, though. I accept that, Judge. And in the well of the court, when instructions are being debated, when the question is whether this instruction will go or not, the judge didn't read the whole instruction. You're supposed to object to things like this. I mean, that's the way the process works. Otherwise, you can mousetrap the district judge by setting all your rights and then coming up here and ask us to fix it. I accept that, Judge. I absolutely accept that and I respectfully represent that it was perfectly clear that we were arguing for an instruction that required the jury to know not what may be considered, but what had to be considered, and that they had to be told that there was a need for an exigency requiring. This question might help you. Yes, ma'am. You know, it's typed out, the version I have, my law clerk typed, so it's all one thing. Was there a title to this? You know, sometimes instructions are. So was the title deploying a taser and then the rest of it was text? I mean, that would, I think, help your argument. Do you understand what I'm saying? Yes, ma'am. It's called use of a taser degree of force. So that's the title. Yes, ma'am. And these two things are different. That was on the top of the proposed instruction. Yes. Okay. See, what I was trying to do, what I was suggesting to you is if the first sentence had been a title, then you could arguably say, well, I read the title of the instruction, so the whole thing's included. But I appreciate your being honest. And we can look at the, eventually, I guess, somewhere here. Yes. Thank you. I would only say that it was never an issue. I've delayed you long enough. It's an issue that it's appropriate for you to raise, and I respectfully submit that it was perfectly clear below. It wasn't even raised by the other side. Then your position is it's not plain error review. It's abuse of discretion review. In this case, it's abuse of discretion and plain error to the extent that the jury was not given an instruction that stated that this . . . I didn't think you'd ever want plain error review. Pardon? I didn't think you'd want plain error review. To the extent that the jury was not given an instruction that it should have been given to address the proper standard, I would say it was plain error. It was certainly abuse of discretion. A couple of points, if I may. Can you also address qualified immunity? Yes, ma'am. You're an experienced lawyer in 1983 cases, and you know the Fourth Circuit law on qualified immunity. I do. Thank you. Let me quote from Amici v. West, a 2001 case that I know because it was my case. This court said, our analysis takes into account not only already specifically adjudicated rights, but those manifestly included within more general applications of a core constitutional principle invoked. Now, of course, that's not only Amici v. West. That's Hope v. Peltzer's Supreme Court case. But we have more than that. Armstrong and Yates were not decided at the time of this incident. They were not, although I point out that Yates, although decided in 2016, imposed liability for a 2008 event. But this was established. Henry v. Pernell was established regarding the necessity for consideration of the force at the moment it's used. Objective reasonableness was clearly established, not subjective fear. The significance of surrender was clearly established. In the Valladares case, in my brief at page 20, I'm not going to read it. I don't have time. And the disproportionality of taser use, depending on the circumstances, including in Myers, where the court pointed out that the subsequent use of the taser was inappropriate, notwithstanding that the person was resisting having his hands handcuffed, which is whatever was being told here. Those points were there specifically, clearly established years before what happened here. And that's without regard to the broader principle that you cannot tase somebody who's done this and is then in a position of submission because you think that he might be thinking of doing something when there is absolutely no objective, reasonable basis for maintaining that belief. So that is my response on the question of qualified immunity, Judge. And I understand the concern that the courts have when they say that you can't just take statements and opinions and turn them into jury instructions. But the common law develops. The common law develops when Graham versus Connor was decided. It says in that very decision there isn't one rule. It's fact specific. And Graham versus Connor is subject to all sorts of clauses in particular cases as the courts deal with new circumstances, new technologies. And Yates and Armstrong represent an articulation specific to the taser function. One moment, if I may, on the 71 seconds. The 71 seconds are the seconds between the time that Hanks got out of the car and spoke to Elton until he's lying on the ground. All of that was consensual and without a problem. And Yates says – Hanks says so. He was cooperative. In fact, he volunteered the glasses. They walked over to the car. It's at the car that things got a little bit dicey. That lasted for 30 seconds. Thereafter, when the video picks up, that's the three seconds. And the notion that he was told to put his hands behind his back, with all due respect, if you look at the video, there isn't enough time for him to do that. If you'll permit me, put your hands behind your back right now. I've done that about 50 times in the past two weeks. Each time – And you've done it several times this morning too. I mean, and your red light's on. One thing that you do need to do though is I want you to confirm in writing to us that this count three is out of this case. That will be done if not today, tomorrow. And with a copy to the other people. Yes. And we appreciate your argument. And we're going to adjourn court for the day. We're going to come down and greet counsel. And then the judges will return to the courtroom and have a session with the students.
judges: Diana Gribbon Motz, Robert B. King, Stephanie D. Thacker